United States District Court
For the Northern District of California

1
2
3          UNITED STATES DISTRICT COURT
4          NORTHERN DISTRICT OF CALIFORNIA
5
6
7    JON HENRY,
8              Plaintiff,                    No. C 12-5818 PJH
9         v.                                **ORDER RE MOTION FOR**
                                            **SUMMARY JUDGMENT**
10   REGENTS OF THE UNIVERSITY
     OF CALIFORNIA,
11
             Defendant.
12   _____/
13        Defendant's motion for summary judgment came on for hearing before this court on

14   January 8, 2014.  Plaintiff Jon Henry ("plaintiff") appeared through his counsel, Spencer

15   Smith.  Defendant Regents of the University of California ("defendant") appeared through

16   its counsel, Delia Isvoranu.  Having read the papers filed in conjunction with the motion and

17   carefully considered the arguments and the relevant legal authority, and good cause

18   appearing, the court hereby GRANTS defendant's motion for summary judgment as

19   follows.

20                              **BACKGROUND**

21        This is an employment discrimination case.  Plaintiff has been employed as a Senior

22   HVAC[1] Mechanic at the University of California, San Francisco ("UCSF") since June 2006.

23   Plaintiff is African-American, and alleges that he has suffered "severe race-based

24   harassment" during the course of his employment.  Complaint, ¶ 11.

25        In the complaint, plaintiff recounts specific incidents that he believes were racially

26   motivated.  First, on or about October 3, 2007, plaintiff alleges that he was "assaulted" by

27   his supervisor's (Gary Vantassel) use of "profanities and threats of physical violence."

28   _____

        [1]"HVAC" refers to "heating, ventilation, and air conditioning."

United States District Court
For the Northern District of California

1   Complaint, ¶ 16.  Another supervisor, Danny Paik, was present when this incident

2   occurred.  Id., ¶ 17.  Plaintiff reported the incident, but claims that he was not allowed to

3   bring his union representative to a meeting held to discuss the incident.  Id., ¶ 20.  Plaintiff

4   also claims that, during this meeting, HR employee Bob Gilmore told plaintiff that "[j]obs are

5   on the line," which plaintiff took as an "insinuati[on] that [his] employment was in jeopardy."

6   Id.  In defendant's motion, it indicates that Vantassel was determined to have "lost his

7   temper and had a lapse in judgment," and even though defendant found no evidence of

8   racial animus, Vantassel's employment was terminated (though defendant does not specify

9   when Vantassel was terminated).  See Dkt. 25 at 5.

10      Plaintiff then alleges that, on October 10, 2007, two employees made a comment to

11  him regarding a private personal health issue.  Complaint, ¶ 21.  Plaintiff reported this

12  incident to HR.  On the same day, plaintiff found that his truck had been vandalized while

13  parked in the UCSF parking lot.  Id., ¶ 22.

14      Plaintiff claims that, on October 12, 2007, Danny Paik unfairly admonished him for

15  sending an email to a client.  Complaint, ¶ 26.  Plaintiff characterizes Paik as one of his

16  supervisors[2].

17      On October 15, 2007, plaintiff had a performance evaluation, during which he was

18  told that he had only "basic journeyman skills."  Complaint, ¶ 27.  Plaintiff claims that this

19  was the first performance evaluation of his career that involved "such a denigrating

20  assessment."  Id.  On the same day, plaintiff claims that a co-worker said to him "Hi

21  Troublemaker.  Are you causing any trouble today?  You need to stop emailing people and

22  just do your job."  Id., ¶ 28.

23  _____

24      [2]The parties provide conflicting evidence as to whether Paik was actually plaintiff's
    supervisor, as defendant contends that they were co-workers.  However, given that defendant
25  is the moving party, the court is obligated to view the evidence in the light most favorable to
    the nonmoving party and draw all justifiable inferences in his favor, and thus assumes that Paik
26  was indeed plaintiff's supervisor.  And because Paik is being treated as a supervisor,
    defendant may be held vicariously liable for any harassment on the part of Paik.  See Swinton
27  v. Potomac Corp., 270 F.3d 794, 803 (9th Cir. 2001).

28

United States District Court

For the Northern District of California

1   On October 16, 2007, plaintiff was working on a component of an air conditioning

2   unit, and claims that an engineer asked him "You still working on that unit? I guess you

3   can't figure it out," and then said "We'd all better leave before he [referring to plaintiff] goes

4   out again for his high blood pressure."  Complaint, ¶ 29.

5   On October 17, 2007, plaintiff claims that "UCSF employee Patrick Lee" asked

6   plaintiff "Do you still want your job here? If you want to know your rights, talk to Mark."

7   Complaint, ¶ 30.  Plaintiff does not indicate who "Mark" is.

8   On or around October 19, 2007, plaintiff was ordered to attend a meeting with "shop

9   steward Bob Hoffer, human resources employee Mike DeGroot," and Danny Paik.

10   Complaint, ¶ 31.  Plaintiff asked to record the meeting "because of Mr. Paik's history of

11   harassing" him, but Paik and DeGroot refused.  Id.  Plaintiff then asked to reschedule the

12   meeting, but DeGroot responded by telling plaintiff that he was suspended, and that he

13   should "get the hell off of UC property."  Id.  Plaintiff claims that he requested a UCSF

14   police escort off campus that day, because he was "fearful of the continued harassment

15   and intimidation."  Id., ¶ 32.

16   Plaintiff alleges that, throughout October 2007, he "continued to contact UCSF

17   supervisors and Human Resources with his complaints," but was told by Human Resources

18   that they were unable to discuss the details of investigations.  Complaint, ¶ 34.

19   Plaintiff claims that, on November 6, 2007, he was "forced" to attend another

20   meeting with DeGroot about the October 12 email incident.  Complaint, ¶ 35.  On the same

21   day, Patrick Lee said to plaintiff "Oh, you're still being a troublemaker.  All they are going to

22   do is 'X' you out of here."  Id., ¶ 36.  Lee then drew 3 Xs on plaintiff's hand, using a marker.

23   Id.

24   Plaintiff then alleges that "Paik's harassment" "continued and intensified" after

25   plaintiff's complaints.  Complaint, ¶ 37.

26   On November 9, 2007, plaintiff claims that he was carrying a fan down a flight of

27   stairs "when he fell, injuring his lower back and neck."  Complaint, ¶ 38.  Plaintiff informed

28   Paik, who "admonish[ed] him for not requesting help" carrying the fan.  Id., ¶ 39.  Plaintiff

3

United States District Court

For the Northern District of California

claims that he was disciplined with a "letter of warning" around this time, and he alleges

that the disciplinary action was "for falling on the stairs." Id., ¶ 43.  In its motion, defendant

claims that plaintiff was disciplined for (1) "acting contrary to an instruction from the Lead

HVAC Mechanic," (2) "walking out of a meeting with management," and (3) "refusing to

leave the premises after being placed on paid leave."  Dkt. 25 at 4.

Plaintiff also claims that, in November 2007, he "filed complaints about the unlawful

activity and the retaliation he suffered" with the State Personnel Board, the National Labor

Relations Board, the Department of Health and Human Services, the Equal Employment

Opportunity Commission, and the Bureau of State Audits.  Complaint, ¶ 42.  Later in the

complaint, plaintiff explains what "unlawful activity" formed the basis of these complaints.

Essentially, plaintiff alleges that he became aware of "illegal and fraudulent misuse of

federal and state funds" by UCSF's Facilities Management Department, in the form of (1)

"sham bidding arrangements for outside contract work," (2) "excessive padding of supply

costs by part vendors, facilitated by inventory warehouse personnel," and (3) "fraudulent

billing of non-UCSF clients for Facilities Management work."  Complaint, ¶ 49.  Plaintiff

alleges one specific incident where he saw that Paik had billed time for a job that he did not

work on, and when he raised the issue to Paik, Paik "became angry" and told plaintiff "I'm

your supervisor and I can put time wherever I want to put time."  Id., ¶ 54.

Plaintiff returned to work on December 14, 2007, but alleges that he did not receive

his workers' compensation checks because the paperwork had not been processed

properly.  Complaint, ¶ 45.  Plaintiff's supervisor Vantassel (who was apparently still

employed at UCSF in December 2007, despite the October 2007 incident with plaintiff)

asked plaintiff "Did you get all of your Christmas gifts for your kids?  Did you get all of your

benefits stuff worked out?"  Id., ¶ 46.  Plaintiff "believes that these comments were

motivated by racial animus against African-Americans and were in retaliation for [plaintiff's]

complaints."  Id.

In his opposition brief (but not in the complaint), plaintiff alleges that "after the

Vantassel incident," he "was on leave for seven to eight months, from December to March,

4

United States District Court

For the Northern District of California

due to his workers' comp injury." Dkt. 26 at 4.  Plaintiff appears to be referring to

December 2008 to March 2009, even though the phrase "Vantassel incident" appears to be

referring to the October 2007 confrontation between plaintiff and Vantassel.  In the

opposition, plaintiff further alleges that, while he was on leave, he had a "mental breakdown

and felt like he did not even want to live anymore." Id. at 4.  He alleges that "his thoughts

of suicide started with the harassment that was going on with Vantassel and his worker's

compensation claim because he did not know how he was going to pay his mortgage and

was having financial problems as a result of Vantassel signing the paperwork late." Id.

Then, in June 2009, plaintiff claims that he was "violently assaulted" by a "contracted

supervisor" in plaintiff's department (Don Carpenter).  Complaint, ¶ 47.  Plaintiff "believes

that this assault was prompted by Don Carpenter's racial animus against African-

Americans." Id. Defendant discusses this incident in its motion, claiming that Carpenter

"yelled" at plaintiff, but that "every witness to the incident denied that Carpenter made any

physical contact with plaintiff." Dkt. 25 at 6.  Defendant also notes that, when plaintiff first

reported the incident, he "made no mention of Carpenter purportedly making physical

contact with him." Id.  However, defendant concedes that Carpenter was found to have

used "inappropriate tone and language," and was told to "keep his distance" from plaintiff.

In his opposition brief (but not in the complaint), plaintiff alleges that "prior to the physical

assault plaintiff testified Mr. Carpenter used racial slurs in reference to African Americans

and Carpenter referenced plaintiff and other African Americans as niggers and monkeys."

Dkt. 26 at 4.

Plaintiff also alleges (in his opposition brief, but not his complaint) that Danny Paik,

at some unspecified time, "continued to make inappropriate racial comments about African

Americans with impunity," and that plaintiff "overheard Paik stating that they were not going

to let a black man manage anybody." Dkt. 26 at 4.  Plaintiff does not provide any time

frame for these alleged racial comments.

The complaint then provides extensive details about the alleged billing manipulation,

and alleges that plaintiff complained to management about the schemes "throughout 2009

United States District Court
For the Northern District of California

1    and 2011." Complaint, ¶ 59.  Plaintiff alleges that, "thereafter," he "continued to suffer

2    intimidation, retaliation, and harassment by Don Carpenter, Danny Paik, and Gary

3    Vantassel for complaining and refusing to participate in the unlawful manipulation

4    processes."  Id.

5         In March 2011, plaintiff "complained to the Department of Health and Human

6    Services, the U.S. Department of Justice, Civil Rights Division, and the EEOC regarding his

7    belief that UCSF was violating laws related to the privacy of his personal health

8    information."  Complaint, ¶ 60.

9         Plaintiff then alleges that another UCSF employee, Cornel Nickelson, "discovered a

10   hangman's noose hanging in a locked maintenance room on the roof of the School of

11   Nursing" in "late 2011 or early 2012."  Complaint, ¶ 61.  Plaintiff does not allege that he

12   personally saw this noose.

13        Plaintiff alleges that, in May 2012, he "became aware that Paik was, once again,

14   fraudulently adding time charged to clients," and as a result, plaintiff "made several more

15   whistleblower complaints."  Complaint, ¶ 62-63.

16        Plaintiff then turns to July 2012, and describes the main incident discussed in the

17   motion papers.  Plaintiff alleges that, on July 10, 2012, Danny Paik "hung a noose in the

18   workplace."  Dkt. 26 at 5.[3]  The complaint further alleges that plaintiff saw the noose on July

19   10, 2012, and felt "it was placed there to intimidate, harass, and threaten him and the other

20   African American Facilities Management Department employees."  Complaint, ¶ 65.

21   Plaintiff further alleges that he felt "it was placed there in retaliation for the complaints

22   [plaintiff] had made and his steadfast refusal to participate in the fraudulent activities of

23   Facilities Management supervisors."  Id.

24        After the noose incident, an email was sent by Steven Parker (the "Superintendent

25   _____

26        [3]The court notes that, in the complaint, plaintiff does not specifically allege that Paik
     hung the noose, and instead alleges that "defendant Doe 1" hung the noose.  Complaint, ¶ 66.

27   However, in his July 25, 2012 EEOC charge and questionnaire, plaintiff alleged that Paik hung
     the noose (see Dkt. 26-7, Ex. P), and plaintiff's opposition brief further alleges that Paik hung

28   the noose.

United States District Court

For the Northern District of California

1    for the Facilities Services in the Skilled Trades and Building Maintenance Worker Group")

2    to plaintiff and two other African-American employees, explaining that Paik had hung the

3    noose "not with racial malice or intent, but, what in his mind at the time, as an innocent

4    prank." Dkt. 26 at 5-6.  Plaintiff alleges that he "has witnessed Steven Parker, along with

5    other supervisors, display racial animus against African-Americans," but provides no further

6    details regarding the racial animus shown by Parker.  Complaint, ¶ 68.

7         Here, the court notes some confusion as to who actually discovered the noose in

8    July 2012.  In the complaint, plaintiff alleges that he "saw the noose on July 10, 2012," but

9    Parker's email stated that "Cornel Nickelson came into [his] office with a photograph of a

10   noose someone had hung."  Compare Complaint, ¶ 65 with Dkt. 26-6, Ex. J.  The

11   investigative report regarding the incident noted that plaintiff's "statement claims he was

12   present with Cornel Nickelson when the noose was discovered," even though "[a]ccording

13   to Nickelson's own written statement and other witnesses, Nickelson was alone when he

14   discovered the noose."  See Dkt. 25-5, Ex. D at 14.  The complaint does not allege that

15   Nickelson was present when plaintiff saw the July 2012 noose, and instead, mentions

16   Nickelson only to say that he "discovered a hangman's noose" on the "roof of the School of

17   Nursing" in "late 2011 or early 2012."  Complaint, ¶ 61.  Thus, it appears that the noose

18   discovered by Nickelson in late 2011 or early 2012 was a different noose than the one

19   discovered in July 2012 (by either plaintiff, Nickelson, or both).  And even though Parker's

20   email mentioned only Nickelson, plaintiff claimed (in his opposition brief and at the hearing)

21   that both he and Nickelson discovered the July 2012 noose.  Dkt. 26 at 20.  Despite these

22   different accounts of who found the noose, the court will construe the facts in a light most

23   favorable to plaintiff, and will assume that plaintiff is correct in claiming that both he and

24   Nickelson discovered the noose that was hung in July 2012.  Neither the complaint nor

25   plaintiff's opposition brief alleges that he saw any other noose, including the noose that

26   Nickelson found in late 2011 or early 2012.

27        In defendant's motion, it provides its own version of the facts surrounding the July

28   2012 noose incident.  Defendant alleges that Paik was "waiting in line" at the Facilities

United States District Court
For the Northern District of California

1   Maintenance Inventory Warehouse to check out materials/inventory, and while he was

2   waiting, he noticed a box of rope and decided to tie some knots, which was a hobby of his.

3   Defendant alleges that Paik decided to tie a noose because it was the most challenging

4   knot he could think of, and not because of any racial connotations.  Defendant alleges that

5   Paik immediately apologized after learning that people were upset.  Defendant also

6   provides details of its response to the incident, placing Paik on administrative leave and

7   beginning a formal investigation.  The investigation was to determine (1) whether Paik tied

8   the noose found by plaintiff and Nickelson, (2) whether Paik demonstrated racial animus

9   towards African-Americans, and (3) whether the Facilities Management department was a

10  racially hostile environment.  See Dkt. 25 at 8 (citing Dkt. 25-5, Ex. D).

11          As part of the investigation, defendant reviewed witness statements and surveillance

12  footage, and determined that the noose that was found on July 10, 2012 was not tied by

13  Paik.  See Dkt. 25 at 11.  While Paik did admit to tying a noose, he stated that he dropped

14  it to the floor after he was done tying it, whereas the noose found by Nickelson and plaintiff

15  had been taped to a box.  Id.  Defendant states that is has not yet identified the individual

16  who tied the noose found by Nickelson and plaintiff.  Id.

17          The investigators also asked witnesses if they had ever witnessed racially biased

18  behavior by Paik, or whether Paik had acted with racial animus towards African-Americans.

19  See Dkt. 25 at 11 (citing Dkt. 25-5, Ex. D).  The investigators found no such evidence of

20  racial animus, nor did they find any record of complaints against Paik for such behavior.  Id.

21          The investigation also included a review of all complaints to UCSF's Office of

22  Affirmative Action and Equal Opportunity made by Facilities Management employees since

23  2007, of which there were five total, and three filed by plaintiff (regarding the 2007

24  Vantassel incident, the 2009 Carpenter incident, and a 2011 incident where plaintiff

25  complained about being denied a handicapped parking space).  See Dkt. 25 at 9-10 (citing

26  Dkt. 25-5, Ex. D).  The other two complaints were filed by employees in a different work

27  group and a different location than plaintiff's.  Id.  After reviewing the complaints, defendant

28  concluded that "it was more likely than not that the Facilities Management department was

8

United States District Court

For the Northern District of California

1    not a racially hostile environment."  Id.

2        During and after the investigation, defendant held meetings with the Facilities

3    Management staff to provide them with information regarding the investigation, and also

4    provided sensitivity trainings and "stand-up" meetings to allow employees to discuss the

5    incident and any other concerns with the workplace.  See Dkt. 25 at 12.  Paik was

6    disciplined regarding his poor judgment and was sent to counseling.  Id.

7        In the complaint, plaintiff alleges that he "received two death threats via his personal

8    cellular telephone's voicemail on or around July 19, 2012."  Complaint, ¶ 72.  Plaintiff does

9    not mention this allegation in his opposition brief.

10       Plaintiff alleges that he was placed on "administrative leave" from July 23, 2012 until

11   September 2012.  Complaint, ¶¶ 77-78.

12       Plaintiff filed a complaint with the Department of Fair Housing and Employment

13   ("DFEH") and an administrative charge with the Equal Opportunity Employment

14   Commission ("EEOC") on July 20, 2012.  See Dkt. 26-7, Exs. N, O.  Plaintiff then filed a

15   supplemental EEOC charge on July 25, 2012.  See Dkt. 26-7, Ex. P.  Plaintiff alleges that

16   he received right-to-sue letters from the Equal Opportunity Employment Commissions

17   ("EEOC") (on October 11, 2012) and the Department of Fair Housing and Employment

18   ("DFEH") (on July 23, 2012).  Complaint, ¶ 82.

19       Plaintiff then filed suit on November 13, 2012, asserting six causes of action: (1)

20   harassment based on race under Title VII, (2) retaliation under Title VII, (3) harassment

21   and hostile work environment based on race under the Fair Employment and Housing Act

22   ("FEHA"), (4) retaliation under FEHA, (5) retaliation under Cal. Labor Code § 98.6, and (6)

23   intentional infliction of emotional distress.   The intentional infliction of emotional distress

24   claim has been voluntarily dismissed, leaving five causes of action remaining.  Defendant

25   moves for summary judgment as to all five[4].

26   _____

27       [4]In a footnote, plaintiff requests that the court continue or deny this motion pursuant to
     Rule 56(d), so that plaintiff may obtain certain documents that were requested during discovery
28   (specifically, plaintiff seeks emails sent by Danny Paik).  However, the court notes that plaintiff

**DISCUSSION**

A.    Legal Standard

A party may move for summary judgment on a "claim or defense" or "part of . . . a claim or defense." Fed. R. Civ. P. 56(a). Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Id.

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Material facts are those that might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. Id.

Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007). On an issue where the nonmoving party will bear the burden of proof at trial, the moving party may carry its initial burden of production by submitting admissible "evidence negating an essential element of the nonmoving party's case," or by showing, "after suitable discovery," that the "nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial." Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc., 210 F.3d 1099, 1105-06 (9th Cir. 2000); see also Celotex, 477 U.S. at 324-25 (moving party can prevail merely by pointing out to the district court that there is

---

did not file a motion to compel regarding the Paik emails, nor is there any indication that plaintiff sought a meet-and-confer regarding the emails, as required by Civil Local Rule 37-1. Having failed to meaningfully pursue these emails during discovery, plaintiff cannot now rely on his document request to delay consideration of this motion. Plaintiff also asks that the court continue or deny defendant's motion "until these depositions occur," but does not explain whose depositions are sought, or why the depositions could not have been conducted before the close of discovery. Accordingly, plaintiff's Rule 56(d) request is denied.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1    an absence of evidence to support the nonmoving party's case).

2          When the moving party has carried its burden, the nonmoving party must respond

3    with specific facts, supported by admissible evidence, showing a genuine issue for trial.

4    Fed. R. Civ. P. 56(c), (e).  But allegedly disputed facts must be material – the existence of

5    only "some alleged factual dispute between the parties will not defeat an otherwise properly

6    supported motion for summary judgment." Anderson, 477 U.S. at 247-48.

7          When deciding a summary judgment motion, a court must view the evidence in the

8    light most favorable to the nonmoving party and draw all justifiable inferences in its favor.

9    Id. at 255; Hunt v. City of Los Angeles, 638 F.3d 703, 709 (9th Cir. 2011).

10   B.    Legal Analysis

11         Plaintiff's five asserted causes of action coalesce into two groups of claims: the

12   retaliation claims (consisting of the second, fourth, and fifth causes of action) and the

13   harassment/hostile work environment claims (consisting of the first and third causes of

14   action).  The court will address each category of claims separately.

15         Retaliation claims

16         As mentioned above, plaintiff asserts three different retaliation claims: retaliation

17   under Title VII (second cause of action), retaliation under FEHA (fourth cause of action),

18   and retaliation under Cal. Labor Code § 98.6 (fifth cause of action).

19         The relevant standard for a retaliation claim under Title VII is the same as under

20   FEHA; both require a plaintiff to show that (1) he engaged in a protected activity, (2) that

21   his employer subjected him to an adverse employment action, and (3) that a causal link

22   exists between the protected activity and the adverse action.  Freitag v. Ayers, 468 F.3d

23   528, 541 (9th Cir. 2006) (Title VII); Steiner v. Showboat Operating Co., 25 F.3d 1459, 1465

24   (9th Cir. 1994) (FEHA).

25         In its motion for summary judgment, defendant primarily takes issue with element

26   (2), arguing that plaintiff was not subjected to any adverse employment action, and further

27   noting that "no specific act of retaliation was alleged in plaintiff's administrative charge."  In

28   his opposition brief, plaintiff (who continues to work for defendant) did not identify any

United States District Court

For the Northern District of California

actual adverse employment action, but instead argued that the "creation of a hostile work environment constitutes an adverse employment action in a retaliation case," and pointed to the fact that the noose incident occurred "a few months" after plaintiff complained of harassment related to other employees padding time.  Plaintiff's position suffers from a number of flaws.  First, plaintiff puts the cart before the horse by assuming that the noose incident actually did create a hostile work environment, when in fact, no determination has yet been made as to whether a hostile work environment was created.  Second, plaintiff provides no support for his apparent belief that the noose (or nooses) was directed at him personally.  As discussed above, as part of a prima facie retaliation claim, plaintiff must establish that <u>he</u> was subjected to an adverse employment action.  Thus, the court finds that plaintiff has not established element (2) of a prima facie case of retaliation, that he was subjected to an adverse employment action.

In addition, even if the court were to assume that the noose incident constituted an adverse action, plaintiff has failed to establish element (3) of a prima facie retaliation case, that a causal link exists between the protected activity of lodging various complaints, and the adverse action.  Plaintiff presents no evidence that the noose incident was motivated by his protected activity, and instead, in the context of his harassment claims, he argues that it was motivated by racial animus.

In order to show the required causal nexus, plaintiff relies on the timing of the noose incident, which occurred "a few months" after plaintiff "complained of race harassment related to Paik padding time on to plaintiff's work assignments."  However, plaintiff alleges that he first complained about Paik's padding of time in November 2007, over four years before the July 2012 noose incident.  <u>See</u> Complaint, ¶ 42 (alleging that, "[i]n November 2007, Mr. Henry filed complaints about the unlawful activity and the retaliation he suffered with the State Personnel Board, the National Labor Relations Board, the Department of Health and Human Services, the Equal Employment Opportunity Commission, and the Bureau of State Audits"); ¶ 54 ("Mr. Henry approached Paik about a job Mr. Henry had completed the day before, November 7, 2007, and which he knew Paik had not worked on

United States District Court

For the Northern District of California

1    despite having billed for labor on it.").  Plaintiff further alleges that "[t]hroughout 2009 and

2    2011," he "complained to UCSF Facilities Management personnel about the manipulation

3    schemes."  Id., ¶ 59.  Even though plaintiff alleges that he made additional complaints

4    "[b]etween May and July 2012," his complaint is clear in alleging that the protected activity

5    began in November 2007 (over four years before the noose incident), and continued

6    "throughout" 2009 and 2011.

7         While "causation can be inferred from timing alone," such an inference can only be

8    made if the adverse action occurred "on the heels" of protected activity.  Villiarimo v. Aloha

9    Island Air, Inc., 281 F.3d 1054, 1065 (9th Cir. 2002).  In finding that an eighteen-month gap

10   between protected activity and adverse action was too long to support a retaliation claim,

11   the court discussed and cited cases finding gaps of four and five months were too long,

12   while gaps of "forty-two" days, "fifty-nine days," and "less than three months" could support

13   an inference of causation.  Id. (citing cases).  Thus, even if plaintiff were able to establish

14   element (2) of a prima facie retaliation case, he would still be unable to establish element

15   (3).

16        For all of the foregoing reasons, the court GRANTS defendant's motion for summary

17   judgment as to plaintiff's second (Title VII retaliation) and fourth causes of action (FEHA

18   retaliaiton).

19        The relevant legal standard for retaliation under Cal. Labor Code § 98.6 is less clear,

20   as neither party has addressed it with any detail, but the language of the statute does

21   require the plaintiff to be "discharged, threatened with discharge, demoted, suspended, or

22   in any other manner discriminated against in the terms and conditions of his or her

23   employment."  The court construes this element similarly to the "adverse action" element of

24   a prima facie retaliation case under Title VII or FEHA.  Thus, for the same reasons as

25   above, the court GRANTS defendant's motion for summary judgment as to plaintiff's fifth

26   cause of action, for retaliation under Cal. Labor Code § 98.6.

27        Harassment/Hostile Work Environment claims

28        Plaintiff asserts claims of harassment under both Title VII and FEHA, which require

13

United States District Court

For the Northern District of California

1  proof of the same elements.  Manatt v. Bank of America, 339 F.3d 792, 798 (9th Cir. 2003)

2  (Title VII); Lyle v. Warner Bros. Television Prods., 38 Cal. 4th 264, 283 (2006) (FEHA).

3  The creation of a hostile work environment through harassment is a form of proscribed

4  discrimination under Title VII.  Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 78

5  (1998); Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 64-65 (1986).  Hostile work

6  environment claims based on racial harassment are reviewed under the same standard as

7  those based on sexual harassment.  Faragher v. Boca Raton, 524 U.S. 775, 786-87 & n.1

8  (1998).

9       Under Title VII, to prove that a hostile environment based on race existed, the

10  plaintiff must show (1) that he was subjected to verbal or physical conduct because of his

11  race; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe

12  or pervasive to alter the conditions of his employment and create an abusive work

13  environment.  Vasquez v. County of Los Angeles, 349 F.3d 634, 642 (9th Cir. 2003); see

14  also Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993); Fuller v. City of Oakland, Cal., 47

15  F.3d 1522, 1527 (9th Cir. 1995).

16       Under both Title VII and FEHA, an employee is required to exhaust his or her

17  administrative remedies by filing a charge with the DFEH (for FEHA claims) and/or the

18  EEOC (for Title VII claims).  The scope of the charge limits the scope of the subsequent

19  civil action.  See, e.g., EEOC v. Farmer Bros. Co., 31 F.3d 891, 899 (9th Cir. 1994); Martin

20  v. Lockheed Missiles & Space Co., 29 Cal.App.4th 1718, 1724 (1994).  Allegations in a

21  complaint not included in a plaintiff's administrative charge "may not be considered by a

22  federal court unless the new claims are 'like or reasonably related to the allegations

23  contained in the EEOC charge.'"  B.K.B. v. Maui Police Department, 276 F.3d 1091, 1100;

24  see also Soldinger v. Northwest Airlines, Inc., 51 Cal. App. 4th 345, 381 (1996) ("Incidents

25  not described in a DFEH charge can be included in the subsequently filed lawsuit . . . if the

26  allegations in the civil complaint were "like or related" to those specified in the DFEH

27  charge.").

28       In this case, plaintiff appears to have filed two sets of administrative charges.  First,

United States District Court
For the Northern District of California

1  on February 22, 2008, plaintiff filed a charge with both the DFEH and EEOC.  See Dkt. 25-

2  2, Ex. A.  The February 2008 charge alleged race discrimination, retaliation, and a breach

3  of plaintiff's medical confidentiality.  Id.  In this charge, plaintiff alleged that the earliest

4  discrimination took place on October 3, 2007, and that the latest discrimination took place

5  on February 7, 2008.  Id.  In the charge, plaintiff noted that he was hired in or around June

6  2006, and that he filed grievances alleging race discrimination on or about October 3, 2007,

7  October 10, 2007, October 25, 2007, and November 9, 2007.  Id.  Plaintiff further alleged

8  that, since filing the grievances, he was "subjected to differential treatment, including

9  access issues with [his] key and badge," "being sent on jobs for customers who had not

10  requested service," having his vehicle "vandalized," receiving "inconsistent direction from

11  Assistant Supervisor Danny Paik," receiving an evaluation which stated that he had only

12  "basic journeyman skills," and "being accused of trying to put work off on another

13  employee."  Id.  In the charge, plaintiff further alleged that two UCSF engineers (Jim

14  Simpson and John Modelza) commented to him about "personal health issues" that plaintiff

15  had not shared with them.  Id.

16          On February 25, 2008, just three days after the charge was received by the EEOC,

17  the EEOC responded.  Specifically, the EEOC sent a letter to plaintiff, in care of "Lisa

18  Charbonneau, Esq." with the firm of "Minami Tamaki LLP," which appears to have been

19  plaintiff's counsel.  Dkt. 25-2, Ex. A.  The letter states that the EEOC had reviewed the

20  information submitted by both parties, and concludes that "there is not sufficient evidence

21  to show that illegal discrimination occurred."  Id.  The letter notes that UCSF provided

22  "evidence showing that it had attempted to resolve Mr. Henry's complaints through

23  mediations and investigations, but Mr. Henry appeared to have refused these offers or

24  refused to cooperate, and also taken actions that were not conducive to resolving his

25  issues."  Id.  The letter further informed plaintiff that he was still free to obtain a notice of

26  right to sue, which would allow him to file suit against UCSF within 90 days.

27          Plaintiff then received a letter from DFEH on April 25, 2008, advising him that DFEH

28  would "not be conducting an investigation into the matter," and that "EEOC should be

15

United States District Court

For the Northern District of California

contacted directly for any discussion of the charge." Dkt. 25-2, Ex. A. The letter further told plaintiff that "[s]ince DFEH will not be issuing an accusation, this letter is also your right-to-sue notice." Id. However, it appears that plaintiff did not file suit based on this letter, and it is unclear whether plaintiff further pursued his claims with the EEOC. Thus, plaintiff's right to file suit based on the February 2008 charge has lapsed. See 42 U.S.C. 2000e-5(f)(1); Cal. Gov't Code § 12960.

Plaintiff's second set of administrative charges were filed in July 2012. See Dkt. 26-7, Exs. O, P. Specifically, plaintiff appears to have filed one charge on July 20, 2012, and a (largely similar) supplemental charge on July 25, 2012. See id. In both charges, plaintiff checked the boxes for discrimination based on race, retaliation, and failure to prevent harassment. In the July 20, 2012 charge, plaintiff alleged that the earliest discrimination took place in 2008, and continued to the present (i.e., the date of filing), and plaintiff described the "particulars" of the unlawful conduct as follows:

> I began working for Respondent on or about June 19, 2006 as a Senior HVAC Mechanic. My most recent job title is Senior HVAC Mechanic.
>
> From 2008 to the present, I have been subject to harassment and discrimination based on my race. Respondent retaliated against me for making complaints to management about the discrimination and harassment at UCSF.
>
> On July 10, 2012, I found a noose hung by a UCSF supervisor in an inventory warehouse, which made me fearful for my safety.
>
> I believe that I was discriminated against because of my race (African-American) in violation of Title VII of the Civil Rights Act of 1964, as amended.

Dkt. 26-7, Ex. O.

In the July 25, 2012 charge, plaintiff alleged that the earliest discrimination took place in 2006, and continued to the present (i.e., the date of filing), and plaintiff described the "particulars" of the unlawful conduct as follows:

> I began working for Respondent on or about June 19, 2006 as a Senior HVAC Mechanic and this is my most recent job title.
>
> From 2006 to the present, UCSF has allowed Danny Paik to harass and discriminate against me because of my race. On July 10, 2012, I found a noose hung by Danny Paik in an inventory warehouse, which made me

United States District Court
For the Northern District of California

1    fearful for my safety.

2    I believe that I was discriminated against because of my race (African-
     American) in violation of Title VII of the Civil Rights Act of 1964, as amended.
3

4    Dkt. 26-7, Ex. P.  Thus, the key difference between the two July 2012 charges is that the

5    later-filed charge specifically alleges that Danny Paik (as opposed to an unnamed "UCSF

6    supervisor") hung the noose that was found on July 10, 2012.  Also, in the July 25, 2012

7    charge, plaintiff listed "Danny Paik, Supervisor at UCSF Facilities Management" as the

8    "employer . . . that I believe discriminated against me or others."  Id.

9         Plaintiff also completed a DFEH "complaint of discrimination" on July 20, 2012,

10   which alleged that "[f]rom 2007 to the present, UCSF has failed to prevent me from being

11   harassed and discriminated against due to my race.  UCSF retaliated against me for

12   complaining to management about the harassment and discrimination."  Dkt. 26-7, Ex. N.

13   Plaintiff also included an attachment to the DFEH complaint, alleging that "[o]n July 10,

14   2012, I found a noose hung by a UCSF supervisor which made me fearful for my safety."

15   Id.  Notably, the only UCSF employee mentioned by name in the July 2012 DFEH

16   complaint is Danny Paik.  Id.

17        Attached to the July 2012 DFEH complaint was an "information sheet" which asked

18   whether plaintiff had "an attorney who has agreed to represent you on your employment

19   discrimination claims in court," to which plaintiff responded "yes," and included the name of

20   his current counsel, Smith Patten.  Dkt. 26-7, Ex. N.  The information sheet also asked how

21   plaintiff "heard about DFEH," to which plaintiff responded by checking the box for

22   "attorney."  Id.

23        In addition to the two (similar) EEOC charges and the DFEH complaint, plaintiff also

24   completed an EEOC intake questionnaire in July 2012.  Dkt. 26-7, Ex. P.  The

25   questionnaire was sent to the EEOC by Smith Patten (plaintiff's counsel) on July 25, 2012,

26   and included a cover letter with the subject line "Re: Jon Henry v. Danny Paik."  Id.  The

27   letter states that Smith Patten "represents the plaintiff in the above-referenced matter," and

28   that enclosed were the "EEOC intake questionnaire and EEOC charge of discrimination to

17

file Jon Henry's complaint against Danny Paik."  Id.  The intake questionnaire itself asked plaintiff to provide the name of the organization that discriminated against him, to which plaintiff responded "Danny Paik, Supervisor at UCSF Facilities Management."  Id.  In the questionnaire, plaintiff alleged race discrimination, retaliation, and failure to prevent harassment, and alleged that the conduct occurred from 2006 to the present (i.e., the filing of the questionnaire).  Id.  Plaintiff described the specific conduct as follows:  "UCSF has allowed Supervisor Danny Paik to harass and discriminate against me because of my race.  On July 10, 2012, I found a noose hung by Mr. Paik in an inventory warehouse, which made me fearful for my safety."  Id.  Plaintiff further alleged that "[t]hese actions were discriminatory because UCSF has allowed me to be harassed and discriminated against since 2006 without responding to my complaints."  Id.

Notably, in each of these four documents (the July 20, 2012 EEOC charge, the July 20, 2012 DFEH complaint, the July 25, 2012 EEOC questionnaire, and the July 25, 2012 supplemental EEOC charge), the only individual mentioned is Danny Paik, and the only conduct mentioned is the July 2012 noose incident.  And while plaintiff makes general references to being "harassed and discriminated against" since either 2006, 2007, or 2008 (the documents are inconsistent as to when the alleged harassment/discrimination started), plaintiff does not mention any other specific conduct other than the noose incident.  While plaintiff's complaint alleges "pervasive" use of the word "nigger," and plaintiff's opposition brief alleges that he "overheard Paik stating that they were not going to let a black man manage anybody" (see Complaint, ¶ 14; Dkt. 26 at 4), neither of these allegations appear in any of the four DFEH/EEOC documents filed in July 2012.

Plaintiff received a right-to-sue letter from the EEOC[5] on October 22, 2012, and filed suit within 90 days (specifically, on November 13, 2012).  Thus, the scope of this suit is defined by the scope of the July 2012 charges.

---

[5]Plaintiff has attached his EEOC right-to-sue letter to his attorney's declaration (See Dkt. 26-7 at Ex. O), but appears not to have included his DFEH right-to-sue letter.

United States District Court
For the Northern District of California

1    As discussed above, the charges are not specific in describing the conduct that

2    gives rise to plaintiff's harassment claims, other than the July 2012 noose incident, and

3    defendant argues that this court's analysis of plaintiff's harassment claims must be limited

4    to that incident.  However, the court does recognize that conduct that is not mentioned in

5    an administrative charge may be included as part of this suit if the conduct is "like or

6    reasonably related" to the conduct described in the charge.  In applying this "like or

7    reasonably related" test, the court looks at whether the newly-alleged conduct "fell within

8    the scope of the EEOC's actual investigation or an EEOC investigation which can

9    reasonably be expected to grow out of the charge of discrimination."  See Farmer Bros., 31

10   F.3d at 899.  The Ninth Circuit has also found it appropriate to consider "such factors as the

11   alleged basis of the discrimination, dates of discriminatory acts specified within the charge,

12   perpetrators of discrimination named in the charge, and any locations at which

13   discrimination is alleged to have occurred."  B.K.B., 276 F.3d at 1100.

14   Also, while the Ninth Circuit has held that administrative charges are to be construed

15   with "utmost liberality," that holding was based on the assumption that such charges are

16   "made by those unschooled in the technicalities of formal pleading."  Freeman v. Oakland

17   Unified School District, 291 F.3d 632, 636 (9th Cir. 2002).  In this case, plaintiff was

18   represented by counsel at the time that he filed his charges, and indeed, plaintiff's July 25,

19   2012 EEOC charge and EEOC intake questionnaire were submitted directly by plaintiff's

20   counsel, on their letterhead.  See Dkt. 26-7, Ex. P.

21   The Freeman court also acknowledged that "there is a limit to such judicial tolerance

22   when principles of notice and fair play are involved."  291 F.3d at 636.  Thus, while the

23   court will liberally construe plaintiff's charges, the fact that plaintiff was represented by

24   counsel when he filed his charges does factor into the court's consideration of the scope of

25   the charges.

26   Because plaintiff's complaint includes a host of allegations that were not included in

27   his administrative charges, and because plaintiff's opposition brief includes a host of

28   allegations that were not previously alleged in either the administrative charges or the

19

United States District Court
For the Northern District of California

1  complaint, the court finds it necessary to make clear which specific conduct is properly

2  included in this suit.

3  As an initial matter, the complaint contains a number of allegations that are

4  unrelated to race.  For instance, the complaint alleges that two (unnamed) employees

5  made comments regarding plaintiff's "personal health issue," and on the same day, plaintiff

6  found that his truck had been vandalized.  Complaint, ¶¶ 21-22.  The complaint also alleges

7  that another (unnamed) employee asked him "You still working on that unit?  I guess you

8  can't figure it out," and then said "We'd all better leave before he [referring to plaintiff] goes

9  out again for his high blood pressure."  Complaint, ¶ 29.  The complaint also mentions two

10  incidents when plaintiff was referred to as a "troublemaker."  Because plaintiff's

11  administrative charges (and related DFEH/EEOC filings) were limited to allegations of

12  discrimination/harassment based on race, and because these allegations are unrelated to

13  race, the court finds that these allegations are not "like or reasonably related" to the July

14  2012 charges, even under a liberal reading of plaintiff's filings.

15  As mentioned above, in all of the documents filed with the DFEH or EEOC in July

16  2012, the only specific conduct mentioned is the July 2012 noose incident, and the only

17  specific individual mentioned is Danny Paik.  Dkt. 26-7, Exs. N-P.  Indeed, as described

18  above, the charges appear to be directed specifically at Danny Paik.  As a result, the court

19  finds that only allegations regarding Paik would "reasonably be expected to grow out of the

20  charge" of harassment, and thus, only allegations regarding Paik would be "like or

21  reasonably related" to the allegations mentioned in the July 2012 charges.

22  Because plaintiff did not file suit after within 90 days after receiving a right to sue

23  letter based on his February 2008 EEOC charge, his claims based on that charge have

24  lapsed, and he may not resurrect those prior claims now.  However, even if the court were

25  to consider the substance of the February 2008 EEOC charge, only three individuals are

26  mentioned in that charge (Danny Paik, Jim Simpson, and John Modelza), and

27  Simpson/Modelza are mentioned only in the context of disability-related allegations which

28  are not part of this suit.  Dkt. 25-2, Ex. A.

20

United States District Court

For the Northern District of California

1    As to Paik, the February 2008 charge alleges only that Paik gave plaintiff

2    "inconsistent direction," and does not allege any racially discriminatory or harassing

3    conduct by Paik.  Id.  So even if the court were to consider the February 2008 charge along

4    with the July 2012 DFEH/EEOC filings, the fact remains that Danny Paik is the only

5    individual accused of any race-related misconduct.  Thus, while the complaint contains

6    many race-related allegations that were not mentioned in the administrative charges

7    (including the allegations against Vantassel and Carpenter), the vast majority of those new

8    allegations do not relate to Paik, and thus cannot be included within the scope of this suit.

9    For instance, plaintiff's complaint alleges that "[s]upervisors and other employees

10   use the word 'nigger' in the workplace," and that "[s]uch conduct is pervasive and

11   accepted."  Complaint, ¶ 14.  However, plaintiff does not make this allegation in the

12   DFEH/EEOC documents at all, nor does the complaint allege that Paik participated in this

13   behavior or that he was even present during such behavior by others, and as such, an

14   EEOC investigation which could reasonably be expected to grow out of plaintiff's charges

15   would not have uncovered these alleged uses of the word "nigger" by these unnamed

16   employees.  In fact, other than the noose incident, the complaint does not allege any race-

17   related conduct involving Paik.  Plaintiff appears to take the position that, simply by

18   invoking the word "harassment" in his administrative charges, he has now sufficiently

19   exhausted his remedies as to all race-related conduct that he now alleges.  However, as

20   the Ninth Circuit has repeatedly pointed out, plaintiff may only bring suit on claims that are

21   "like or reasonably related" to allegations mentioned in his administrative charges.  See,

22   e.g., Freeman, 291 F.3d at 636.  Plaintiff cannot simply mention the word "harassment" in

23   an administrative charge and receive a blank check to file suit on any racially-harassing

24   conduct that he can now think of.  See id. at 637 ("The rule of liberal construction does not

25   suggest that a plaintiff sufficiently exhausts his administrative remedies under Title VII by

26   merely mentioning the word 'discrimination' in his or her EEOC administrative charge.").

27   Because plaintiff, through his chosen attorney, elected to limit the scope of his

28   administrative charges (and other DFEH/EEOC filings) to include only allegations against

United States District Court

For the Northern District of California

1   Paik, the court similarly limits the scope of this suit to allegations made against Paik.

2       Regarding Paik, the complaint alleges that Paik was present during Vantassel's

3   alleged assault of plaintiff, and further alleges that plaintiff "believes that this verbal assault

4   was prompted by racial animus against African-Americans," but plaintiff does not allege that

5   Paik was in any way involved in the alleged assault, nor does he allege that Paik engaged

6   in similar behavior based on a similar motive.  See Complaint, ¶¶ 16-17.  Despite that,

7   plaintiff includes the conclusory allegation that "[f]ollowing Gary Vantassel's assault, Paik

8   continued to harass Mr. Henry based on his race."  Complaint, ¶ 24.  However, in the

9   following paragraphs, plaintiff alleges conduct by Paik that is unrelated to race.  For

10  instance, the complaint alleges that, "[o]n or around October 12, 2007, Paik admonished

11  Henry for sending an email to a client, alleging that Mr. Henry had failed to follow Paik's

12  directions," even though, in plaintiff's view, "Mr. Paik had in fact instructed Mr. Henry the

13  day before to notify all parties of facts relating to that client's work order."  Complaint, ¶ 26.

14  While Paik may indeed have been wrong in admonishing plaintiff, there is no indication that

15  Paik's admonishment was based on racial animus, nor does plaintiff specifically suggest

16  such a link.  The complaint further alleges that, after plaintiff injured himself while carrying a

17  condenser fan in November 2007, Paik "responded to Mr. Henry's report of injury by

18  admonishing him for not requesting help carrying the condenser fan."  Complaint, ¶ 39.

19  Again, regardless of whether Paik was correct in admonishing plaintiff, there is no

20  indication that Paik's admonishment was based on racial animus, nor does plaintiff

21  specifically suggest such a link.  The complaint also describes an exchange where Paik

22  "became angry" with plaintiff in November 2007, after plaintiff questioned Paik's time

23  records, but again, there is no indication that Paik's anger was based on racial animus, nor

24  does plaintiff specifically suggest such a link.  Complaint, ¶ 54.  If anything, plaintiff

25  suggests that Paik was angry because plaintiff had confronted him about his alleged billing

26  fraud.

27      With regard to all three of these incidents involving Paik (the October 2007

28  admonishment regarding email, the November 2007 admonishment regarding the fan, and

United States District Court

For the Northern District of California

the November 2007 confrontation regarding billing practices), the court does agree that an investigation which could reasonably be expected to grow out of plaintiff's charges may have uncovered the conduct, based on the fact that the charges focused on Paik. However, the court notes that plaintiff's February 2008 charge did not specifically mention any of these incidents, and instead made only a vague reference to receiving "inconsistent direction" from Paik, which would apply only to the October 2007 email admonishment. Thus, any allegations regarding the November 2007 fan admonishment and the November 2007 confrontation regarding billing practices are barred based on plaintiff's failure to exhaust, and even if plaintiff had mentioned those incidents in his February 2008 EEOC charge, his claims would have lapsed due to his failure to file suit after receiving a right to sue notice.  However, even if the court were to generously apply the continuing violation doctrine, and ignore the fact that plaintiff already had an opportunity to pursue these claims, there are no facts, other than plaintiff's speculation, that any of these incidents were motivated by racial animus on the part of Paik.  The one race-related comment attributable to Paik (set forth below) along with his responsibility for leaving a noose in the workplace do not serve to render every interaction between him and plaintiff evidence of race-based harassment.  Thus, because plaintiff has not provided any evidence that he was subjected to these three incidents "because of his race," as required to establish a prima facie harassment case under either Title VII or FEHA, the court will not consider any of these 2007 allegations as part of plaintiff's harassment claims.

Plaintiff attempts to add new allegations against Paik in his opposition brief, but does not provide any explanation why these allegations could not have been made earlier, either in the July 2012 administrative charges or in the complaint.  Specifically, plaintiff alleges that he "overheard Paik stating that they were not going to let a black man manage anybody." Dkt. 26 at 4.  Notably, the only source cited for this allegation is plaintiff's own deposition, and the deposition excerpts provided by plaintiff do not reflect when this statement was allegedly made.  Plaintiff further alleges that Paik was present during the alleged assault of plaintiff by John Carpenter, and further alleges that Carpenter used racial

23

United States District Court

For the Northern District of California

1   slurs, but plaintiff does not allege that Paik was present during any such use of racial slurs,

2   nor does plaintiff allege that Paik was even aware of Carpenter's use of racial slurs.  The

3   opposition brief also mentions the use of racial slurs by another individual (John Simpson),

4   but plaintiff does not allege that Paik was in any way involved with these racial slurs, or that

5   Paik himself ever used a racial slur.  Thus, even if the court were to consider all of the

6   conduct that is newly-alleged in the opposition brief, the only conduct that is arguably "like

7   or reasonably related" to the conduct mentioned in the July 2012 charges is Paik's

8   comment (alleged to have been overheard by plaintiff) that the department was "not going

9   to let a black man manage anybody."  Even though this alleged statement was not

10   mentioned in any of plaintiff's administrative filings, and even though plaintiff still fails to

11   provide a time frame during which the statement was heard, the court will liberally construe

12   plaintiff's charges and will consider the allegation properly exhausted.  Accordingly, when

13   considering whether plaintiff's harassment claims suffice to withstand summary judgment,

14   the relevant conduct is limited to (1) Paik's comment (made at some unspecified time) that

15   the department was "not going to let a black man manage anybody", and (2) the July 2012

16   noose incident.

17       As mentioned above, there remains much confusion around the July 2012 noose

18   incident.  Plaintiff claims to have seen a noose, and claims that the noose was hung by

19   Paik, but defendant claims that plaintiff saw a noose hung by someone other than Paik

20   (even as defendant admits that Paik did indeed tie a noose and leave it in a warehouse

21   accessible by plaintiff and others).  Based on these conflicting accounts, it appears that two

22   different nooses may have been hung in July 2012 (in addition to the earlier noose alleged

23   to have been found by Nickelson in late 2011 or early 2012).  However, plaintiff alleges to

24   have seen only a single noose, which he alleges was hung by Paik.  While defendant

25   claims that someone else hung the noose that was seen by plaintiff, it has not provided any

26   evidence showing who hung the noose seen by plaintiff, or what became of the noose tied

27   by Paik.  Thus, because the court is to view evidence in the light most favorable to the

28   plaintiff and draw all justifiable inferences in his favor, it will assume for purposes of this

United States District Court

For the Northern District of California

1    motion that Paik did indeed hang the noose that plaintiff saw.  Thus, when determining

2    whether plaintiff has created a triable issue of fact as to whether Paik's conduct constituted

3    harassment, the court will consider (1) Paik's comment that the department was "not going

4    to let a black man manage anybody," and (2) the hanging of a noose, by Paik, in July 2012.

5         In general, the Ninth Circuit has found that such "isolated" incidents, occurring

6    sporadically over a long period of time, are not severe or pervasive enough to alter the

7    conditions of employment.  See, e.g., Manatt v. Bank of America, NA, 339 F.3d 792,

8    795-99 (9th Cir. 2003) (co-workers' use of the term "China-man," ridicule of the plaintiff's

9    mispronunciation of English words, statement that "I've had the worst kind of trouble with

10   your countrymen," using gestures mocking the appearance of Asians – held to be

11   insufficient to create a hostile work environment); Vasquez v. County of Los Angeles, 349

12   F.3d at 642-44 (comments by supervisor of plaintiff deputy probation officer that he had "a

13   typical Hispanic macho attitude" and was a "juvenile delinquent," and that he should work in

14   the field because "Hispanics do good in the field," plus negative remarks and complaints

15   made about the plaintiff and yelling at him – held insufficient to create a hostile work

16   environment); Kortan v. California Youth Authority, 217 F.3d 1104, 1110-11 (9th Cir. 2000)

17   (comments by supervisor calling female employees "castrating bitches," "Madonnas," or

18   "Regina" on several occasions in plaintiff's presence, and calling the plaintiff "Medea" – held

19   insufficient to create a hostile work environment).

20        District courts have similarly held that isolated instances of offensive conduct are

21   insufficient to create a triable issue of fact on a hostile work environment claim.  See

22   Alvarado v. FedEx Corp., 2006 WL 644875 at *15-16 (N.D. Cal. Mar. 13, 2006)

23   (supervisor's use of single racial slur held insufficient to create a hostile work environment,

24   even when considered in context of supervisor's constant negative criticisms, and

25   statements that plaintiff was too slow and fat to work for the employer); Hercules v. Dep't of

26   Homeland Security, 2008 WL 1925193 at *20-21 (N.D. Cal. Apr. 29, 2008) (supervisor's

27   use of "bitch" and "nigger" on two separate occasions, possibly directed at plaintiff, and

28   making of occasional derogatory comments in the presence of plaintiff's co-workers, to the

United States District Court

For the Northern District of California

1    effect that plaintiff was "not going nowhere" and was "not going to do anything," and would

2    never be promoted, held insufficient to establish a continuous, pervasive pattern of racial

3    slurs); Stevens v. County of San Mateo, 2006 WL 581092 at *5-6 (N.D. Cal. Mar. 7, 2006)

4    (isolated and sporadic age- and race-based comments directed at the plaintiff, such as

5    "stupid old man," "old barking dog," "old gangster," and "you're my nigger" were

6    insufficiently severe or pervasive to alter the terms and conditions of employment).

7         Also, while the court does consider both (1) Paik's comment that the department

8    was "not going to let a black man manage anybody," and (2) the hanging of a noose, by

9    Paik, in July 2012, it does appear that the gravamen of plaintiff's harassment claims is the

10   July 2012 noose incident; given that it is the only incident discussed in any of plaintiff's

11   DFEH/EEOC filings, and given that it is described extensively in the complaint, whereas the

12   comment about not letting "a black man manage anybody" is not in the complaint and

13   appears for the first time in plaintiff's opposition brief.  The Ninth Circuit has held that "[i]f a

14   single incident can ever suffice to support a hostile work environment claim, the incident

15   must be extremely severe," and a California court of appeals has similarly held, in a FEHA

16   harassment case, that an incident "must be severe in the extreme and generally must

17   include either physical violence or the threat thereof."  Brooks v. City of San Mateo, 229

18   F.3d 917, 926 (9th Cir. 2000); Herberg v. California Institute of the Arts, 101 Cal.App.4th

19   142, 151 (2002).  As applied to this case, if plaintiff had provided evidence that the noose

20   was directed at him personally (either by being placed in his personal work area such as

21   his locker, or containing a note or a picture indicating that he was the target of the display),

22   then the court would agree that the noose could serve as a threat of violence.  Instead,

23   plaintiff offers no evidence (other than his own self-serving deposition testimony) supporting

24   his argument that the noose served as a threat of violence to him specifically.

25        However, courts outside of this district have found a single display of a noose

26   sufficient to defeat summary judgment.  See, e.g., Wilson v. NYC Dept. of Transportation,

27   2005 WL 2385866, at *22 (S.D.N.Y. 2005); Smith v. Town of Hempstead, 798 F.Supp.2d at

28   453 (E.D.N.Y. 2011).  But in both Wilson and Smith, the court found that the noose (or

United States District Court

For the Northern District of California

nooses) was directed specifically at the plaintiff, or at African-American employees as a group.  Specifically, in Wilson, a noose was hung outside of the plaintiff's locker (and plaintiff was also sent an "overtly threatening letter containing a picture of a noose").  2005 WL 2385866, at *22.  In Smith, the court found that the noose was hung in a "central garage" where "all African American employees would pass."  798 F.Supp.2d at 453.  In contrast, plaintiff in this case has provided no facts supporting a finding that the noose (or nooses) was directed specifically at him, or at any other African-American employees.  As a result, the court finds that this case is closer to McCoy v. City of New York than it is to Wilson or Smith.  See McCoy, 131 F.Supp.2d 363, 374 (E.D.N.Y. 2001).  In McCoy, the court found that four sets of race-related incidents, including the display of a noose, were insufficiently severe or pervasive to alter the conditions of employment.  Similarly, in Bolden v. PRC Inc., the Tenth Circuit affirmed a grant of summary judgment on the plaintiff's hostile work environment claim where the plaintiff had shown only "a few isolated incidents of racial enmity" instead of "a steady barrage of opprobrious racial comments."  43 F.3d 545, 551 (10th Cir. 1994).  While the Bolden court agreed that the treatment of plaintiff (which included being called a "nigger" and told that he "better be careful because we know people in [the] Ku Klux Klan") was "blatant racial harassment," it emphasized that the racial slurs were "infrequent" and "came from only two of [plaintiff's] coworkers on a couple of occasions," and thus affirmed the grant of summary judgment in favor of the defendant.  Id.

Here, when considering (1) Paik's comment that the department was "not going to let a black man manage anybody," and (2) the display of a noose by Paik in July 2012, and considering the evidence in a light most favorable to plaintiff, the court agrees that plaintiff was arguably subjected to physical and verbal conduct because of his race, and that the conduct was unwelcome.  For even if the noose was not directed specifically at plaintiff, because of the legacy of slavery and its aftermath, a reasonable African-American would have been offended by being confronted with such an emotionally-charged symbol in the workplace.  However, a prima facie case of harassment also requires that the conduct be sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and

United States District Court

For the Northern District of California

1  create an abusive work environment.  On this final element, plaintiff's harassment claims

2  fail.  While Paik's conduct was certainly objectionable, it is not actionable, because the two

3  incidents were not sufficiently severe or pervasive so as to alter the conditions of plaintiff's

4  employment and create an abusive work environment when compared with the incidents

5  described in all of the cases set forth above.  Accordingly, defendant's motion for summary

6  judgment is GRANTED as to plaintiff's harassment claims under both Title VII (first cause

7  of action) and FEHA (third cause of action).

## CONCLUSION

9      As to all five of plaintiff's asserted causes of action (three retaliation claims, and two

10  harassment/hostile work environment claims), defendant's motion for summary judgment is

11  GRANTED.

12      **IT IS SO ORDERED.**

13  Dated: February 24, 2014

14  _____
    PHYLLIS J. HAMILTON

15  United States District Judge